STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

14-5 c/w CW13-1300 and 14-142

PINE PRAIRIE ENERGY CENTER, LLC
AND PLAINS MARKETING, LP

VERSUS

EDDIE SOILEAU, SHERIFF AND EX OFFICIO TAX COLLECTOR,
PARISH OF EVANGELINE, STATE OF LOUISIANA AND DIRK
DEVILLE, ASSESSOR, EVANGELINE PARISH, STATE OF LOUISIANA

************

APPEAL FROM THE
THIRTEENTH JUDICIAL DISTRICT COURT
PARISH OF EVANGELINE, NO. 73106-B
HONORABLE THOMAS F. FUSELIER, JUDGE

************

J. DAVID PAINTER
JUDGE

************

Court composed of Sylvia R. Cooks, J. David Painter, and Phyllis M. Keaty, Judges.

Cook, J., dissents.

AFFIRMED.

Brian A. Eddington
8941 Jefferson Hwy, Ste. 200
Baton Rouge, LA 70809
COUNSEL FOR DEFENDANTS-APPELLANTS:
    Eddie Soileau, Sheriff and Ex Officio Tax Collector for Evangeline
    Parish and Dirk Deville, Assessor for Evangeline Parish

Jesse R. Adams, III
Andre B. Burvant
201 St. Charles Ave., 51st Fl.
New Orleans, LA 70170
COUNSEL FOR PLAINTIFFS-APPELLEES:
    Pine Prairie Energy Center, LLC, and Plains Marketing, LP and the
    Industrial Development Board No. 1 of the Parish of Evangeline, State
    of Louisiana, Inc.

**Anthony L. Walker**
**1101 W. Main St.**
**Ville Platte, LA 70586**
**COUNSEL FOR PLAINTIFF-APPELLEE:**
    **Industrial Development Board No. 1 of the Parish of Evangeline, State of Louisiana, Inc.**

**PAINTER, Judge.**

Defendants, Eddie Soileau, Sheriff for Evangeline Parish (the Sheriff), and Dirk Deville, Assessor for Evangeline Parish(the Assessor), appeal the trial court's grant of summary judgments filed by the Plaintiffs, Pine Prairie Energy Center, L.L.C. (PPEC) and Plains Marketing, L.P., the parent company of PPEC. For the following reasons, we affirm.

### FACTS AND PROCEDURAL HISTORY

PPEC operates an underground natural gas storage facility and associated facilities and pipelines located in Evangeline Parish (the PPEC project). PPEC obtained the appropriate authorization for construction and operation of the PPEC project from the Federal Energy Regulatory Commission in 2004. In May 2005, an application was filed with the Evangeline Parish Police Jury (Police Jury) for the establishment of Evangeline Parish Industrial Development Board Number 1 (the IDB). The application included articles of incorporation indicating that the purpose of the IDB was to acquire, own, and lease property to PPEC as a means of encouraging PPEC to locate in the parish. An ordinance was adopted allowing creation of the IDB, approving its articles of incorporation, and appointing a board of directors.

In July 2005, the IDB entered into a memorandum of understanding with PPEC agreeing to issue bonds to finance the acquisition and construction of the project property, which would be owned by the IDB and leased to PPEC, and agreeing that the property would not be subject to *ad valorum* property taxes. In January 2006, the Police Jury and PPEC entered into an agreement affirming the understandings and undertakings in the memorandum of understanding, including the exemption from property taxes on the property during the lease period. On March 20, 2006, the Assessor sent a letter to PPEC stating that the Assessor's

1

Office would not consider the property covered by the lease to be subject to taxation as long as it was owned by the IDB.

The Police Jury approved the issuance of bonds by the IDB. In January 2006, Chesapeake Energy Marketing sold the Chalk Pipeline to PPEC. In May 2006, PPEC conveyed the property comprising the PPEC project (the PPEC project property) including the Chalk Pipeline, the CGT Meter Site, and the gas storage facility, to the IDB and leased it back. In 2011, the Assessor placed the PPEC project property on the tax rolls. PPEC objected and paid the taxes under protest.

On January 25, 2012, PPEC and Plains Marketing, L.P. filed the suit currently before this court on appeal under docket number 14-5 asserting that they were not the owner of any of the property listed in the assessments, including the gas storage facility property, the Chalk Pipeline and the CGT Meter Site, seeking a declaratory judgment that the PPEC project property was exempt from taxation, and that they were entitled to refund of the taxes paid under protest. The suit was later amended to add the IDB as a party plaintiff. The Assessor determined that the storage facility property had been conveyed to the IDB, cancelled the assessments, and reissued them in the name of the IDB. The Sheriff refunded the taxes paid under protest.

On January 29, 2013, PPEC, on its own behalf and on behalf of the IDB, filed an additional suit, now before this court on appeal under docket number 04-142, seeking recovery of taxes paid under protest and declaratory judgment that the property at issue is owned by the IDB, and that, as such, it is exempt from property taxes, as well as cancellation of the tax notices, and a permanent injunction prohibiting the Assessor and the Sheriff from issuing any future tax assessments.

PPEC filed a motion for summary judgment in each suit. In the original suit, in a motion filed on August 15, 2013, Plaintiffs asked for summary judgment as follows:

1) Finding that Petitioners do not owe any *ad valorem* property taxes on any property that is owned by the Industrial Development Board No 1 of the Parish of Evangeline State of Louisiana, Inc. (Evangeline Parish IDB);

2) Finding that the Chalk Pipeline and CGT Meter Site as defined in the accompanying Memorandum are not owned by Petitioners as they were conveyed to the Evangeline Parish IDB;

3) Finding that the property owned by the Evangeline Parish IDB is exempt from *ad valorem* property taxation;

4) Ordering a refund of all unreimbursed *ad valorem* property taxes paid by Petitioners under protest along with interest as provided by law; and

5) Prohibiting the Sheriff and the Assessor and from issuing to Petitioners any future assessments, tax bills, tax notices, tax liens, notices of seizure or adjudications related to the Chalk Pipeline, the CGT Meter Site or any other property as long as it is owned by the Evangeline Parish IDB.

In the second suit, Plaintiffs asked for a partial summary judgment as follows:

1 Finding that the Chalk Pipeline and CGT Meter Site are owned by the IDB;

2 Finding that property owned by the IDB is public property and is thus exempt from *ad valorem* property taxation;

3 Cancelling all assessments, tax notices, tax statements or bills issued to the IDB and all assessments, tax notices, tax statements or bills issued to PPEC regarding the Chalk Pipeline and the CGT Meter Site;

4 Ordering a refund to PPEC of all *ad valorem* property taxes paid under protest along with interest as provided by law; and

5 Declaring that any future assessments, tax bills, tax notices, tax liens, notices of seizure or other adjudications related to the Chalk Pipeline CGT Meter Site or all other property that is owned by the IDB for as long as it is owned by the IDB are void *ab initio,* null, illegal and of no effect.

3

After hearing arguments, the trial court granted Defendants a summary judgment in the first suit and a partial summary judgment in the second suit. Defendants filed a writ with this court asking for an unlimited appeal, which is before this court under docket number 13-1300 and which this court referred to the merits. Defendants appeal the judgments of the trial court, and this court has consolidated the matters on appeal on its own motion.

## DISCUSSION

*Summary Judgment*

Appellate courts review trial courts' ruling on motions for summary judgment *de novo*. *Sanchez v. Harbor Const. Co., Inc.*, 07–0234, p. 4 (La.App. 4 Cir. 10/3/07), 968 So.2d 783, 786. "An appellate court reviews a trial court's decision granting summary judgment *de novo* using the same standard applied by the trial court in deciding the motion for summary judgment." *Id.* "'An appellate court thus asks the same questions as does the trial court in determining whether summary judgment is appropriate: whether there is any genuine issue of material fact, and whether the mover-appell[ee] is entitled to judgment as a matter of law.'" *Williams v. Mem'l Med. Ctr.*, 03–1806, p. 13 (La.App. 4 Cir. 3/17/04), 870 So.2d 1044, 1052–53, *quoting Smith v. Our Lady of the Lake Hosp., Inc.*, 93–2512, p. 26 (La.7/5/94), 639 So.2d 730, 750.

"The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions, together with the affidavits, if any, show that there is no genuine issue as to material fact, and that mover is entitled to judgment as a matter of law." La. C.C.P. art. 966(B)(2). As to the burden of proof, the burden:

> remains with the movant. However, if the movant will not bear the burden of proof at trial on the matter that is before the court on the motion for summary judgment, the movant's burden on the motion does not require him to negate all essential elements of the adverse party's claim, action, or defense, but rather to point out to the court that there is an absence of factual support for one or more elements essential to the adverse party's claim, action, or defense. Thereafter, if the adverse party fails to produce factual support sufficient to establish that he will be able to satisfy his evidentiary burden of proof at trial, there is no genuine issue of material fact.

La. C.C.P. art. 966(C)(2). "The summary judgment procedure is

4

designed to secure the just, speedy, and inexpensive determination of actions." *MeritPlan Ins. Co. v. DeSalvo*, 03–1493, p. 3 (La.App. 4 Cir. 3/24/04), 871 So.2d 461, 463. "The procedure is favored and shall be construed to accomplish these ends." La. C.C.P. art. 966(A)(2).

*St. Bernard I, LLC v. Williams*, 12-372, pp. 5-6 (La.App. 4 Cir. 3/13/13), 112 So.3d 922, 926, *writ denied*, 13-1008 (La. 6/14/13), 118 So.3d 1090.

*Ownership of the Pipeline*

Defendants assert that the trial court erred in finding that "the Chalk Pipeline was conveyed to the IDB through an Act of Conveyance dated May 9, 2006, and a Conveyance and Lease Addendum No. 1 dated November 12, 2007."[1]

Defendants argue that the conveyance did not by its terms include the actual pipeline but only "fee properties, lease and easements and rights of way." Plaintiffs assert that the actual pipeline is an accessory to the pipeline servitude and, as such, was included in the sale of the servitude pursuant to La.Civ.Code art. 2461.

After reviewing the Act of Conveyance and the applicable law, we find that the pipeline is an accessory to the pipeline servitude as argued by Plaintiffs. *See Ortego v. Sevarg Co., Inc.*, 550 So.2d 340 (La.App. 3 Cir. 1989). Therefore, we agree that it was conveyed along with the servitudes.

*Constitutionality of La.R.S. 51:1160*

Defendants first assert that La.R.S. 51:1150 is unconstitutional because La.Const. art. VII § 21(A) provides the only basis for exemptions from *ad valorem* property taxes as follows: "In addition to the homestead exemption provided for in Section 20 of this Article, the following property and no other shall be exempt from ad valorem taxation: (A) Public lands; other public property used for public purposes."

---

[1] Defendants conceded ownership of the CGT Meter Site in their appeal brief.

5

Louisiana Revised Statutes 51:1160 states, with regard to municipal and parish industrial development boards, that:

> The corporation is hereby declared to be performing a public function on behalf of the municipality or parish with respect to which the corporation is organized and to be a public instrumentality of such municipality or parish. Accordingly, the corporation and all properties at any time owned by it and the income therefrom and all bonds issued by it and the income therefrom shall be exempt from all taxation in the state of Louisiana; provided, however, that the corporation may require the lessee of each of the projects of the corporation to pay annually to parish or municipal taxing authorities, through the normal collecting agency, a sum in lieu of ad valorem taxes to compensate such authorities for any services rendered by them to such projects which sum shall not be in excess of the ad valorem taxes such lessee would have been obligated to pay to such authorities had it been the owner of such project during the period for which such payment is made. Such payments to be made in lieu of taxes together with any fees and charges of such public trust, to the extent in the aggregate they do not exceed the amount of taxes that would be paid if the lessee were the owner, shall constitute statutory impositions within the meaning of R.S. 47:2128. Also for the purposes of R.S. 51:708(1) and any amendment thereto or substitution therefor, bonds issued by the corporation shall be determined to be securities issued by a public instrumentality of a political subdivision of the state of Louisiana.

"This statute is entitled to the presumption of constitutionality, and [Defendants have] the burden of proving that the statute is unconstitutional." *Bd. of Assessors of City of New Orleans v. City of New Orleans*, 02-691, p. 14 (La.App. 4 Cir. 9/25/02), 829 So.2d 501, 509, *writ denied*, 02-2633 (La. 1/10/03), 834 So.2d 439.

We find that this statute does not, as Defendants argue, create a new class of exempt property, rather, in it, the legislature clarifies that municipal and industrial development boards are, by definition, performing a public function and, therefore, fall into the class of organization covered by La.Const. art. 7 § 21.

Defendants do not argue that the IDB is not a public entity, rather they argue that it does not own the PPEC project property and that it is not public property because that conveyance from PPEC to IDB is a simulation. Simulation is defined

6

by La.Civ.Code art. 2025 as: "A contract is a simulation when, by mutual agreement, it does not express the true intent of the parties." Defendants assert that the sale with option to purchase and lease-back show that there was not a true intent to transfer ownership.

> The party alleging that the purported sale was a simulation bears the burden of proving with reasonable certainty that the sale was simulated. *Thompson v. Woods*, 1525 So.2d 174 (La.App. 3 Cir.1988). If any consideration is given for the conveyance, the sale is not a simulation. *Id.*

*Bennett v. Porter*, 10-1088, pp. 9-10 (La.App. 3 Cir. 3/9/11), 58 So.3d 663, 671.

*See also St. Bernard*, 112 So.3d 922.

Further, La.R.S. 9:3371 states that:

> Sale/lease-back commercial transactions involving immovable or movable property with a fair market value in excess of twenty-five thousand dollars and located within this state are hereby declared to be valid and enforceable. Such transaction shall produce and result in the legal consequences described in the written sale/lease-back agreement between the parties and shall not be presumed to be a simulation.

It is unquestioned that the PPEC property conveyed to the IDB and subsequently leased back to PPEC had a commercial value in excess of twenty-five thousand dollars. As stated in *Entergy Louisiana, Inc. v. Kennedy*, 03-166, p. 8 (La.App. 1 Cir. 7/2/03), 859 So.2d 74, 80, *writ denied*, 03-2201 (La. 11/14/03), 858 So.2d 430, "a transaction will not be set aside as a simulation if any consideration supports the transaction; the reality of the transference is thus established."

The Act of Conveyance contains the following description of the consideration for that transaction:

> This act of conveyance is made for and in consideration of Vendee issuing its Taxable Industrial Development Revenue Bonds (Pine Prairie Energy Center LLC Project) Series 2006 (the "Bonds") for the purpose of financing the acquisition, construction and installation of all facilities necessary and appropriate in connection with the establishment of natural gas storage, pipelines and related handling and storage facilities within the Parish of Evangeline, State

7

of Louisiana (the "Facility") to be located on the Property, which Facility and Property will be owned by Vendee and leased to Vendor for a rental that is sufficient in amount to pay the principal of, interest and premium on the Bonds when they become due pursuant to a Lease Agreement dated of even date herewith by and between Vendee, as lessor, and Vendor, as lessee.

The lease agreement by which the property was leased back to PPEC provided for payments in lieu of taxation, or PILOT payments, on the storage facility to the Sheriff and Ex Officio Tax Collector as follows:

**Section 5.2 <u>PILOT Payments</u>**

(a)     Beginning with the calendar year following the year in which the In Service Date has occurred, and for each calendar year thereafter during the Lease Term, the Lessee shall make a PILOT payment of $500,000, but if and only if the average of the annual *ad valorem* inventory tax revenues applicable to natural gas in the Project caverns for the prior three consecutive calendar years (the "Three Year Average") is less than $500,000, in which case the PILOT payment applicable for such calendar year shall be the difference between $500,000 and the Three Year Average (it being understood that the Three Year Average for the first calendar year shall be $500,000, and that the "Three Year Average" for the second such calendar year shall be the average of the actual *ad valorem* inventory tax for such year and the prior calendar year). For the avoidance of doubt, if the Three Year Average for any calendar year is $500,000 or more, the Lessee shall not be required to make any PILOT payment for such calendar year pursuant to this paragraph.

. . . .

(c)     In addition to the foregoing, the Lessee shall make a PILOT payment with respect to the pipeline commonly referred to as the "LA Chalk Pipeline" which generally constitutes the pipeline segment of approximately 33 miles of 24-inch diameter buried pipeline, beginning at a point on the Louisiana Chalk Gathering System commonly referred to as "Tennessee Junction" in Rapides Parish, Louisiana (Section 34-T1S-R2W) and extending southward, through the Parish to an existing point of interconnection with the facilities of El Paso Field Services Company's Eunice Gas Processing Plant in Acadia Parish, Louisiana (Section 12-T75-R2W). The PILOT payment shall be only with respect to that portion of the LA Chalk Pipeline that is situated in the Parish, shall be payable commencing with respect to the calendar year after the year which such pipeline is acquired by the Issuer, shall be in an amount not to exceed $45,000 per annum (payable in arrears) and shall be payable to the Sheriff on or prior to December 31 of each year.

. . . .

**Section 5.3 <u>Obligation to Defease/Repay School Bonds</u>.** In addition to PILOT payments set forth herein, the Lessee agrees to make, on the date which is the earlier of (i) 13 months following the In Service Date; or (ii) March 1, 2008, a payment in lieu of a PILOT payment, which shall be made to the Paying Agent for the Pine Prairie School District No. 4 General Obligation Bonds, which bonds were issued on March 1, 2001 in the original principal amount of $3,750,000 (the "School Bonds"). Such payment shall be in an amount sufficient to defease or otherwise pay the principal and interest on the School Bonds (at their then outstanding balance based on the existing amortization schedules) in full or to provide for their payment in full at the next available redemption date; provided that the issuer thereof (x) may not agree to an increase in the principal amount of such School Bonds or an increase in the interest rate or other amounts which would be due the owners of the School Bonds; and (y) may not agree to an amendment to the amortization schedule which has the effect of postponing the payment of any principal or interest or other amount; and (z) must continue to be current with respect to payments of principal and interest thereon.

In light of these provisions, we conclude that there was valid consideration for the conveyance and lease-back agreements and, as a result, that no simulation occurred.

Defendants next argue that the property is not being used for a public purpose. Defendants assert that in order to be considered as being used for public purposes, the use must be direct use by the public. However, the Louisiana Supreme Court, in considering the definition of public use in the context of expropriation has stated that:

> While actual public use of the servitude may play a role in the appropriate case in determining whether the expropriation serves a public purpose, we do not read the constitutional provision and the statutes granting ExxonMobil its authority to expropriate private property as restricting expropriating real estate to that on which the pipeline itself is placed, **nor do we interpret these provisions and the jurisprudence as requiring direct public use as the sole factor in determining whether the expropriated property will serve a public purpose.**

*Exxon Mobil Pipeline Co. v. Union Pac. R.R. Co.*, 09-1629, p. 8 (La. 3/16/10), 35 So.3d 192, 197 (emphasis added). This court, in *Town of Vidalia v. Unopened*

9

*Succession of Ruffin*, 95-580, pp. 6-7 (La.App. 3 Cir. 10/4/95), 663 So.2d 315, 319

(footnote omitted), explained that:

> Defendants in the case *sub judice* contend that in order to show a public purpose, there must be "a general public right to a definite use of the property, as distinguished from a use by a private individual or corporation which may prove beneficial or profitable to some portion of the public." *River & Rail Terminals, Inc. v. Louisiana Ry. & Nav. Co.*, 171 La. 223, 130 So. 337 (1930). Despite this restrictive language, the Louisiana jurisprudence has not defined "public purpose" so narrowly. *See Texas Pipe Line Co. v. Stein*, 190 So.2d 244 (La.App. 4 Cir.1966), *reversed on other grounds*, 250 La. 1104, 202 So.2d 266 (1967) ("'actual public use' is not the criteria by which public purpose is determined"). Rather, any allocation to a use resulting in advantages to the public at large will suffice to constitute a public purpose. Moreover, a use of the property by a private individual or corporation, when such use is merely incidental to the public use of the property by the state or its political subdivisions, does not destroy an otherwise valid public purpose. In considering this issue, the Louisiana Supreme Court has noted that:

>> "'public use' is synonymous with 'public benefit,' 'public utility' or 'public advantage,' and . . . authorize[s] the exercise of the power of eminent domain to promote such public benefit, etc., especially where the interests involved are of considerable magnitude, and it is sought to use the power in order that the natural resources and advantages of a locality may receive the fullest development in view of the general welfare."

> *City of New Orleans v. New Orleans Land Co.*, 136 So. at 92.

In this case, the benefit to the public was outlined clearly in the affidavit of Dr. William A. Ward, President of the IDB, wherein he stated, in pertinent part, with regard to the PPEC Project that:

3.

> In an effort to encourage Pine Prairie Energy Center, LLC ("PPEC") to acquire, construct and install a natural gas storage facility, and the necessary equipment and pipelines (the "Project"), the IDB authorized me, acting as President, to take any and all actions and to sign any and all documents, instruments, contracts or writings that would be necessary to encourage PPEC to locate the Project in Evangeline Parish. The IDB specifically resolved that the acquisition, construction, and installation of the Project would benefit the welfare and economy of the citizens of Evangeline Parish and it was in the

10

public interest of those citizens to encourage the location of the Project in the Parish.

. . . .

8.

The project has resulted in an investment of approximately $700,000,000 in Evangeline Parish.

9.

During the construction phase of the Project, over 500 individuals were employed at the project.

10.

The project has resulted in the permanent creation of 20 full-time jobs with wages double the average of Evangeline Parish.

11.

The construction and operation of the Project has generated approximately $10,000,000 in sales and use tax for Evangeline Parish, and Evangeline Parish is currently receiving approximately $1.2 million annually in *ad valorem* taxes on the natural gas stored at the facility.

12.

Since the Project came on line, PPEC has made of $450,000 in PILOT payments to Evangeline Parish under the Lease Agreement and has also made significant financial contributions that support various organizations and causes in Evangeline Parish.

13.

PPEC voluntarily provided the Evangeline Parish School Board with $3.2 million to retire general obligation bonds that the Evangeline Parish School Board issued in 2001 for use in significant upgrades to school facilities in Pine Prairie, Louisiana.

In light of this information, which was not countered in any way by Defendants, and the jurisprudence defining use for a public purpose, we find that the PPEC project is beneficial to the public of Evangeline Parish and, thus, is being used for a public purpose.

11

## CONCLUSION

Having so found, we agree with the trial court that there is no material fact remaining but that Plaintiffs are entitled to judgment finding that the IDB is the owner of the Chalk Pipeline, that all the PPEC project property is public property being used for a public purpose and is therefore exempt from taxation for ad valorem property taxes from the date of the conveyance of the property from PPEC to the IDB, and that Defendants should be enjoined from issuing further tax assessments, bills and/or liens, and from instituting any further enforcement proceedings against PPEC or the IDB in connection with this property during the term of the lease-back between those parties. Accordingly, the judgment of the trial court is affirmed.

Costs of this appeal are assessed to Defendants-Appellants, Eddie Soileau, Sheriff and Ex Officio Tax Collector for Evangeline Parish, and Dirk Deville, Assessor for Evangeline Parish.

**AFFIRMED.**